# Wytheville.

## TALBOT v. CITY OF NORFOLK.

June 13, 1929.

The opinion states the case.

*James G. Martin*, for the plaintiffs in error.

*R. W. Peatross, City Atty., John S. Rixey, Asst. City Atty.*, and *J. Paul Jackson*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This is an action of ejectment which (a jury being waived) was submitted to the judge of the trial court. There was a final judgment in favor of the defendant,

the city of Norfolk, to which the plaintiffs have been allowed a writ of error.

The facts are definite and the evidence is almost entirely documentary. The father of the plaintiffs, William H. Talbot, by deed dated May 15, 1851, conveyed to Indian Poll Draw Bridge Company, a corporation, a strip of land thirty feet wide by 200 feet long as an abutment for a bridge, and in the same deed conveyed three acres of land in addition, which is thus described: "Also a tract, piece or parcel of land adjoining thereto and containing nearly three acres, bounded on the west by the said slip of land and the main road leading to the said bridge, on the north by the land of William H. Talbot and on the eastward and southward by the said Tanner's creek; as the same has been laid off by the company for its uses and purposes forever, provided, nevertheless, that if the said company shall abandon, or cease to keep in use, its bridge for the space of three years, or should the corporate privileges of the said company in any manner cease, or be abandoned or forfeited, that the said strip of land and the said tract of nearly three acres, shall *ipso facto* thereupon revert to and belong to the said William H. Talbot, his heirs or assigns."

This action is brought to recover the southern half of the three-acre tract to which the plaintiffs claim title as devisees under the will of William H. Talbot, relying upon the clause of the deed just quoted. The plaintiffs do not seek in this action to recover the abutment of the bridge which was conveyed by the same deed and is subject to the same contract, stating that they are willing to let that go for the public needs.

The plaintiffs aver that the defendant city claims under that deed, while the defendant denies that this is true, and bases its denial upon unquestioned facts:

It contends that it is unnecessary to construe the deed referred to because it does not claim through or under it either as the successor of the Indian Poll Draw Bridge Company or through William H. Talbot, as grantor in that deed. It contends that its title originates with the Tanner's Creek Draw Bridge Company, and that if in its inception there was any defect in that title, it has since ripened into a perfect title by adverse use and possession.

The bridge, which was built by the Indian Poll Draw Bridge Company across Tanner's creek, was burned by Confederate troops upon their retreat from United States forces, May 10, 1862, and had not been rebuilt on July 23, 1865. Because of its destruction and this failure to rebuild, another company, the Tanner's Creek Draw Bridge Company, was incorporated by the General Assembly of Virginia by an act approved February 7, 1865 (Laws 1865, chapter 15), for the purpose of rebuilding it. This act of incorporation recites that the draw bridge had been desrtoyed on the 10th of May, 1862; that the Indian Poll Draw Bridge Company had failed to rebuild or repair it; and that such failure had caused serious loss and inconvenience to the citizens of Norfolk county and of the city of Norfolk. It was therein provided that books for stock subscriptions should be opened by the commissioners, among whom was William H. Talbot, the grantor in the deed referred to, and that when $3,000.00 of capital stock had been subscribed, the persons so subscribing should be an incorporated company under the name of Tanner's Creek Draw Bridge Company, and vested with all the rights and privileges of similar corporations; that the incorporation was upon condition that the bridge to be erected by it should not obstruct navigation, and that unless commenced within

one year and completed within three years from the passage of the act, the rights so granted should be forfeited. Then follows the sixth section of the act, in these words:

"And be it further enacted, that if the Indian Poll Draw Bridge Company shall have failed to reconstruct this bridge before the tenth day of May, one thousand eight hundred and sixty-five, all the rights and privileges vested in the State by the forfeiture thereof by the said Indian Poll Draw Bridge Company are hereby vested in the company to be created under the provisions of this act, but the Tanner's Creek Draw Bridge Company shall pay to the stockholders of the Indian Poll Draw Bridge Company the value of the remaining property of the last-named company, the amount to be ascertained either by mutual agreement between the parties, by arbitrators agreed upon by the parties, or by five commissioners, freeholders of the vicinity, to be appointed by the Governor, upon the application of the Tanner's Creek Draw Bridge Company, at any time after the first day of May, one thousand eight hundred and sixty-five in case of failure to agree or arbitrate as aforesaid."

It appears from this that the charter of the original grantee in the deed from Talbot has been forfeited, so that the condition or limitation contained in the deed had either, if a limitation, revested the grantor with the property here involved, or, if a condition subsequent, entitled him to re-enter for the breach of conditions. It also appears that the bridge was not rebuilt within three years, so that both of the contingencies upon which that title depended had supervened.

The new company built another bridge on the same site and opened it for traffic in September, 1865. It has since then been continuously operated. It was

operated by successive companies as a toll bridge until acquired by the county of Norfolk in 1915. Then it was operated as a free bridge by Norfolk county until 1923, and thereafter, from 1923 until the present time, by the defendant, the city of Norfolk.

The record is silent as to any claims or contracts as between Talbot and the new company at the time the second bridge was built, and also as to the actual possession of the three-acre tract of land mentioned in the Talbot deed, until 1885, but it is shown that in 1885 it was in the possession of the Tanner's Creek Draw Bridge Company, enclosed with a fence, and within this enclosure there was a toll house, the residence and garden of the toll-keeper of the bridge, employed by that company. That fence remained until 1902, when the northern half of this three-acre tract was sold by the Consolidated Turnpike Company, successor in title to the Tanner's Creek Draw Bridge Company, to the Bay Shore Terminal Company, and by the Bay Shore Terminal Company sold to the Virginia Electric and Power Company. The parcel directly involved in this action is the southern half of the three-acre tract, title to and adverse possession of which is claimed to have descended from the Tanner's Creek Draw Bridge Company (the builder of the bridge in 1865), by an unbroken chain, to the city of Norfolk. The city of Norfolk and its predecessors in title have had the use and possession of this property certainly since 1885, and the bridge over Tanner's creek has been continuously operated since 1865.

The contention for the plaintiffs in error is that the city of Norfolk claims through or under the Talbot deed and his grantee, the Indian Poll Draw Bridge Company, and is based on the facts which have been recited. We think it perfectly clear that these facts

do not sustain this contention. The charter of the Indian Poll Draw Bridge Company, its franchise to build or operate the bridge, terminated and it had no corporate rights to transfer. Whether it had or claimed this or any property does not appear. So far as the record discloses, all the rights involved to which the city of Norfolk has succeeded are derived from the Commonwealth by its own charter and the charter of the Tanner's Creek Draw Bridge Company and its successors. The charter of the last-named company in terms recites that "all the rights and privileges vested in the State by the forfeiture thereof by the said Indian Poll Draw Bridge Company are hereby vested in the company to be created under the provisions of this act." The Commonwealth, of course, had no power and did not attempt either to divest the stockholders of the old company of its property, or to invest the new company with any title thereto. If there were any property rights, these belonged to the stockholders of the old company and not to the Commonwealth. No question can be raised as to the right and power of the Commonwealth to declare this forfeiture of the franchise, because the old company held it subject to section 27, chapter 64, of the Code of 1860, which reads:

"When an act is hereafter passed to authorize the erection of a toll bridge, if the work be not commenced within one year from the passage of such act, or be not completed within two years after such commencement, or if, after its completion, there be an abandonment of the bridge, or a failure for three successive years to keep it in good order; in each of these cases the privileges granted by the said act shall cease." Code 1860, chapter 56, section 30, provides that the assets of a dissolved corporation shall be distributed

among its members according to their respective interests. It is quite manifest then that even if it had the power, the State did not undertake to transfer any of the property of the old company to the new company, and there is no evidence that the new company acquired any of its property from the old corporation. Certainly it was a new, different and independent enterprise.

We may assume that William H. Talbot, who had a direct interest in the property which is here involved, as well as the stockholders of the old company, were alert to preserve such property rights as they then had, but those who might have testified are doubtless all dead and as to all of this the record is silent.

■ The briefs discuss at some length various questions which might have been originally of consequence as to the construction of the reversionary provisions of the Talbot deed of 1851. Counsel for the plaintiffs in error maintain that it was a condition subsequent, and that this condition subsequent was violated by the latest transfers of the bridge property, whereby it ceased to be a toll bridge operated by a private corporation and became first the property of the county of Norfolk and thereafter the property of the city of Norfolk. We do not think a discussion of this question would be profitable, but we think it might very well have been held that the provision was not a condition subsequent, such as requires a re-entry by the grantor in order to revest him with his original estate, but on the contrary that it was a base, or terminable, or qualified fee. It certainly seems to meet the conditions and definitions of such an estate, as indicated by so careful a writer as Professor Graves. He says (Graves' Notes on Real Property), section 37, page 42, title, "Base or Qualified Fee": "This estate is also called

a determinable fee. Following Chancellor Kent (4 Com. 9) we shall treat the terms base, qualified and determinable, as synonymous.

"A base fee, then, is an estate which may last forever, but whose duration is circumscribed by something collateral to it, which may never happen; but, if it does happen, the estate is, immediately and *ipso facto*, at an end. The estate is a fee, but limited to and upon an event which may never take place. The event is in the nature of a limitation of the estate, and not an express condition, whereby to defeat it. An estate is limited until the event and no longer; but as the event may not happen, the law considers the estate a fee. * * *" Continuing, he says: "So long as a base fee continues, the owner has all the rights with respect to it which he would have as to a fee simple. It will descend to his heirs, if not sold; and if sold, it will determine (end) upon the happening of the event upon which it was limited into whosesoever hands it may have come. (1 Prest. Est. 440; 1 Wash. R. P. 62.)"

Tested by this definition, no violence would be done to the language used in the deed should it be held that this was a fee determinable in the Indian Poll Draw Bridge Company, to be held by it until that corporation should abandon or cease to keep the bridge in use for the space of three continuous years; and that it should also determine should the corporate privileges of that company in any manner cease or be forfeited. Under that construction, upon the occurrence of either of these events, the fee was determined and the estate thereupon revested in the grantor, William H. Talbot.

The trial court quite wisely determined not to enter upon a discussion of the difficult and perplexing

questions which generally arise in any case in which it is even suggested that the estate involved is a determinable fee, a conditional limitation, or a condition subsequent. Many of the distinctions are difficult to apprehend and some applications of these distinctions are more difficult to comprehend. Whichever or whatever the estate created by the deed, it is perfectly certain that the property, since the Indian Poll Draw Bridge Company abandoned the operation of the bridge for three years and forfeited all of its charter rights and ceased to exist, has been held by the Tanner's Creek Draw Bridge Company and its successors, the last of whom is the city of Norfolk, by adverse possession for more than fifteen years, which, under the circumstances of this case, has ripened into a fee simple title.

We agree with the trial court upon this point. He has expressed his conclusions thus:

"Under the legal rule that conditions subsequent are not favored in law because they tend to destroy estates, the court will never permit an absolute gift to be defeated unless it is perfectly clear that the very case has happened in which it is declared that the forfeiture shall take place. *People's Pleasure Park Co. v. Rohleder*, 109 Va. 439, 61 S. E. 794, 63 S. E. 981.

"And it might well be argued here that the very event in contemplation of the parties to the deed was a failure to keep the bridge in use either by abandonment of the bridge itself on the part of the corporation or by a forfeiture of the corporate privileges. The whole purpose in view was the establishment and maintenance of a bridge so that the grantor and those situated like him should have ready access to the city by means of the bridge and not have to go miles around by land.

"But quite apart from this it is reasonably clear that both grounds of forfeiture occurred in 1865. The bridge was burned in 1862 and not rebuilt for more than three years, so the original company *ceased to keep in use its bridge for the space of three years.*

"The second ground of forfeiture is as follows: 'should the coporate privileges of said company in any manner cease, or be abandoned or forfeited.' And it is recited in the charter of the Draw Bridge Company that the franchise of the Indian Poll Bridge Company has been forfeited to the State; and it does not affect the clause of forfeiture that it was attempted to pass them on to the Draw Bridge Company. These franchises and privileges of the Indian Poll Bridge Company were quite as much forfeited then as they are now that the Draw Bridge Company has ceased to exist.

"Certainly it cannot be said that *the privileges of the said company did not in any manner cease or be abandoned or forfeited.*

"If then the plaintiffs invoke the exact terms of this clause of reversion in the deed of 1851 they must stand or fall by its precise language. And in my judgment both grounds of forfeiture became available to grantor in 1865. He could then have brought his action of ejectment. His cause of action arose then for the reason that the bridge had been burned and not rebuilt in three years and the franchise and privileges of the said company had been forfeited to the State. Under these circumstances the condition subsequent became operative and 'the said tract of nearly three acres (did) *ipso facto* revert to and belong to the said William H. Talbot, his heirs and assigns.' He could then have brought his action of ejectment and the statute of limitations ran from that time.

"In my opinion the plaintiffs have failed to prove their title to this property and judgment should be entered for the defendant."

*Affirmed.*